P. send

FILED
CLERK, U S DISTRICT COURT

JUL 2 0 2004

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

1

2

3

4

5

6

7

8

9

10

11

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRO SOFTNET CORP., | CASE NO. CV 04-02219 MMM (CWx) |
| Plaintiff, | |
| vs. | ORDER GRANTING DEFENDANT'S MOTION TO DISMISS |
| 2M ASSET MGMT., LLC, | |
| Defendant. | |

Plaintiff brought this action under 28 U.S.C. § 2201(a) against defendant 2M Asset Management, LLC, seeking a declaration that United States Patent No. 6,321,254 is invalid and not infringed.  2M has moved to dismiss, asserting (1) that any controversy between the parties had not ripened into an "actual controversy" within the meaning of the Declaratory Judgment Act at the time suit was filed, and (2) that, even if there was an actual controversy between the parties, the court lacks personal jurisdiction over 2M.[1]

DOCKETED ON CM

JUL 2 0 2004

BY                    010

---

[1]In the alternative, 2M requests that the court transfer the action to the District of South Carolina pursuant to 28 U.S.C. § 1404.

15

1

## I. FACTUAL BACKGROUND

2      Plaintiff Pro Softnet Corporation markets an on-line file storage and sharing service under

3  the trademark "iBackup."[2]  Defendant 2M Asset Management, LLC is the assignee of United

4  States Patent 6,321,254 ("the '254 patent"), which claims a method and apparatus directed to the

5  secure off-site storage and retrieval of electronic data over a public wide-area network.[3]  2M does

6  not sell any products or render any services; rather, it intends to derive all of its income from

7  licensing the '254 patent.[4]

8      On February 12, 2004, 2M's counsel sent a letter (the "February 12 Letter") to

9  Raghavendra Kulkarni, Pro Softnet's president.  The letter advised Kulkarni that 2M had retained

10  counsel to assist it in licensing the '254 patent.[5]  The letter described the patent, which issued in

11  November 2001, as "generally directed to the secure off-site storage and retrieval of electronic

12  data over a public wide-area network, such as the Internet."[6]  It asked that Pro Softnet "review

13  the [enclosed] '254 patent and respond no later than March 9, 2004 to let us know your interest

14  in licensing the '254 patent."[7]

15      Upon receiving the February 12 Letter, Kulkarni "was immediately concerned" because

16  the letter was sent certified mail "from an unknown attorney."[8]  He visited the website of 2M's

17  counsel, Polasek, Quisenberry & Errington ("PQE"),[9] and "became more concerned when [he]

18

---

19    [2]Complaint, ¶ 5.

20    [3]See Declaration of Uwe Mundry ("Mundry Decl."), ¶ 3.

21    [4]*Id.*

22    [5]*Id.*, ¶ 5, Ex. B ("February 12 Letter").

23    [6]*Id.*

24
25    [7]*Id.*  The letter noted that 2M "would be pleased to provide a draft license agreement setting forth the license terms if you so desire." *Id.*

26    [8]Declaration of Raghavendra Kulkarni ("Kulkarni Decl."), ¶ 6.

27
28    [9]Kulharni's declaration does not state when he visited the PQE website.  As defendant notes, the print-outs of the relevant web pages attached to plaintiff's papers are dated June 4,

1   saw that the law firm specializes in contingency fee patent litigation."[10]   Kulkarni's concern grew

2   as he reviewed the patent, which he found to be "extremely broad, apparently covering many

3   functions that virtually define the internet, such as client transmittal and remote central storage

4   of data."[11]   Kulkarni had "never heard of" 2M before receiving the February 12 Letter, and his

5   attempts to discover information about the nature of its business were unsuccessful.[12]

6        On February 23, 2004, Kulkarni sent a response to 2M's counsel (the "February 23

7   Letter").   He advised that Pro Softnet had no need to license third party technology, as its

8   products were based on "open source" technologies and "certain proprietary technologies that are

9   developed in house."[13]   Kulkarni asserted that the technology described in the '254 patent had

10  been in use "long before 1997, the filing date identified in the . . . patent,"[14] and stated that, "[i]f

11  there [was] a need for further communication, [Pro Softnet would] involve [its] Patent/Trademark

12  litigation attorney firm."[15]   This letter "was intended to be the end of communications with 2M

13

14  _____

   2004.   (See Kulkarni Decl., Exs. 2, 3.)

15

16     [10]*Id.*   Kulkarni asserts that the header of the firm's web-page describes "attorneys focusing
   on contingent fee patent litigation."   *Id.*   The first paragraph of the web page, attached to

17     Kulkarni's declaration as Exhibit 2, states in full: "PQE is an Intellectual Property Law Firm
   (located in the Houston, Texas area) that is dedicated to protecting and enforcing clients'

18     intellectual property on an hourly, modified billing or contingent-fee basis.   While PQE provides
   a full range of intellectual property services, its emphasis is on patent litigation and licensing."

19     *Id.*, Ex. 2.

20     [11]Kulkarni Decl., ¶ 7.

21

22     [12]*Id.*, ¶ 8 ("I attempted to find information about '2M Asset Management, LLC,' which
   I had never heard of.   I could find nothing on the internet about 2M Asset Management – no

23     products, no business, no website, no listings in any business directories I could think of.   I asked
   several colleagues in internet business whether they had heard of '2M Asset Management," and

24     all said they had never heard of it.   In my mind, 2M fit the mold of a small-time 'inventor' who
   came out of nowhere to make outlandishly broad patent claims").

25

26     [13]See Mundry Decl., Ex. C.

27     [14]*Id.*

28     [15]*Id.*

                                               3

1    or its counsel – that is why I wrote that the issue would be directed to our *litigation* counsel if

2    there was any further communication."[16]

3              On March 19, 2004, 2M's counsel replied (the "March 19 Letter").  2M stated that it

4    wished "to clarify that we are not suggesting that you replace your existing technology with our

5    client's technology.  Instead, we are suggesting that you study the '254 patent with a view towards

6    taking a license under it as to your existing technology."[17]  The letter asked that Pro Softnet

7    forward to 2M any "documents or other evidence that you believe renders the claims of the '254

8    patent invalid," as well as an explanation as to "why you believe such evidence would render the

9    claims of the '254 patent invalid."[18]  It requested that Pro Softnet provide such information by

10   March 31, 2004.

11             Kulkarni contends he "was surprised to receive a fax from [2M's attorney] in 'response'"

12   to his letter.[19]  He asserts that after reading the March 19 Letter, he "could not imagine any

13   reasonable meaning other than that" 2M believed "Pro Softnet's existing technology requires a

14   license to avoid infringing the '254 patent."[20]  Kulkarni "turned the matter over to Pro Softnet's

15   litigation attorneys."[21]   The attorneys were authorized to file a lawsuit against 2M seeking

16   declaratory relief, and this action was filed on March 31, 2004.

17

18                                    **II.  DISCUSSION**

19   **A.    Legal Standard Governing Motions To Dismiss Under Rule 12(b)(1)**

20             Because a Rule 12(b)(1) dismissal is procedural in nature, the general standard for judging

21

22             [16]Kulkarni Decl., ¶ 11.

23             [17]*Id.*, Ex. D.

24             [18]*Id.*

25             [19]Kulkarni Decl., ¶ 12.

26

27             [20]*Id.*, ¶ 14.

28             [21]*Id.*, ¶ 15.

4

1   subject matter jurisdiction is dictated by regional circuit rather than Federal Circuit law.  See

2   *Toxgon Corp. v. BNFL, Inc.*, 312 F.3d 1379, 1380 (Fed. Cir. 2002) ("We review a dismissal for

3   lack of subject matter jurisdiction according to regional circuit law, since it is a procedural

4   question not unique to patent law," citing *Madey v. Duke University*, 307 F.3d 1351, 1358 (Fed.

5   Cir. 2002)).

6        Rule 12(b)(1) attacks can be either facial or factual.  See *White v. Lee*, 227 F.3d 1214,

7   1242 (9th Cir. 2000) ("Rule 12(b)(1) jurisdictional attacks can be either facial or factual");

8   *Thornhill Publishing Co. v. General Telephone & Electronics*, 594 F.2d 730, 733 (9th Cir. 1979)

9   ("A motion to dismiss for lack of subject matter jurisdiction may either attack the allegations of

10  the complaint or may be made as a 'speaking motion' attacking the existence of subject matter

11  jurisdiction in fact. . .").  When a Rule 12(b)(1) challenge is facial, courts must accept the

12  allegations of the complaint as true.  See *Valdez v. United States*, 837 F. Supp. 1065, 1067 (E.D.

13  Cal. 1993), aff'd., 56 F.3d 1177 (9th Cir. 1995).  When a Rule 12(b)(1) challenge is factual,

14  courts may ordinarily "hear evidence regarding jurisdiction and . . . rule on that issue prior to

15  trial, resolving factual disputes where necessary.  In such circumstances, '[n]o presumptive

16  truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not

17  preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Roberts v.*

18  *Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987).[22]  Here, defendant has proffered evidence

19  _____

20  [22] There is an exception to this general framework, pursuant to which the court "may not
    resolve genuinely disputed facts where 'the question of jurisdiction is dependent on the resolution

21  of factual issues going to the merits.'" *Roberts*, *supra*, 812 F.2d at 1177 (quoting *Augustine v.*

22  *United States*, 704 F.2d 1074, 1077 (9th Cir. 1983)); see also *Rosales v. United States*, 824 F.2d
    799, 803 (9th Cir. 1987) ("A district court may hear evidence and make findings of fact necessary

23  to rule on the subject matter jurisdiction question prior to trial, if the jurisdictional facts are not
    intertwined with the merits").  Where jurisdiction is intertwined with merits, "the district court

24  [must] assume[ ] the truth of the allegations in a complaint . . . unless controverted by undisputed
    facts in the record" (*Roberts*, *supra*, 812 F.2d at 1177), or treat the motion as a motion for

25  summary judgment (*Careau Group v. United Farm Workers*, 940 F.2d 1291, 1293 (9th Cir. 1991)

26  ("where jurisdiction is so intertwined with the merits that its resolution depends on the resolution
    of the merits, 'the trial court should employ the standard applicable to a motion for summary

27  judgment'")).  As the jurisdictional issue raised by defendant's motion does not address the merits

28  of the case, the court need not select one of these alternatives.

1    outside the pleadings. Accordingly, the court considers the motion a factual attack upon subject

2    matter jurisdiction.

3    **B.      Whether There Is An Actual Controversy Between The Parties**

4         It is axiomatic that "the federal courts established pursuant to Article III of the Constitution

5    do not render advisory opinions." *United Public Workers v. Mitchell*, 330 U.S. 75, 88 (1947).

6    This is because the jurisdiction of Article III courts is limited to "cases" and "controversies." See

7    U.S. CONST. ART. III, § 2, cl. 1 ("The judicial Power shall extend to . . . Cases . . . [and]

8    Controversies . . ."); *Utah v. Evans*, 536 U.S. 452, 459 (2002) ("Article III, § 2 of the

9    Constitution extends the 'judicial Power' of the United States to actual 'Cases' and

10   'Controversies'"); *Muskrat v. United States*, 219 U.S. 346, 356 (1911) (". . . by the express

11   terms of the Constitution, the exercise of the judicial power is limited to 'cases' and

12   'controversies'"). The Declaratory Judgment Act thus limits the power of a federal court to issue

13   declaratory relief to suits involving a "case of actual controversy." See 28 U.S.C. § 2201 ("In

14   a case of actual controversy . . . any court of the United States, upon the filing of an appropriate

15   pleading, may declare the rights and other legal relations of any interested party seeking such

16   declaration"); *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-40 (1937) ("The Declaratory

17   Judgment Act of 1934, in its limitation to 'cases of actual controversy,' manifestly has regard to

18   the constitutional provision and is operative only in respect to controversies which are such in the

19   constitutional sense").

20        The declaratory judgment mechanism is particularly valuable in patent disputes. "The Act

21   serves the policies underlying the patent laws by enabling a test of the validity and infringement

22   of patents that are possibly being used only as what Learned Hand, in *Bresnick v. United States*

23   *Vitamin Corp.*, 139 F.2d 239, 242 (2nd Cir. 1943), called 'scarecrows.'" *Arrowhead Industrial*

24   *Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 735, n. 4 (Fed. Cir. 1988). The court looks to

25   Federal Circuit precedent in such a dispute to determine whether the "actual controversy"

26   requirement of the Declaratory Judgment Act has been satisfied. See *Goodyear Tire & Rubber*

27   *Co. v. Releasomers, Inc.*, 824 F.2d 953, 955, n. 3 (Fed. Cir. 1987).

28        The Federal Circuit applies a two part test to determine whether a declaratory judgment

6

action regarding the validity and/or infringement of a patent involves "a case of actual controversy." "[T]he test requires two core elements: (1) acts of defendant indicating an intent to enforce its patent; and (2) acts of plaintiff that might subject it or its customers to suit for patent infringement." *Arrowhead*, *supra*, 846 F.2d at 737; see also *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1326 (Fed. Cir. 1998) ("When a declaratory judgment plaintiff alleges that the claims of a patent are not infringed, invalid, or unenforceable, we apply a two-step test to determine whether there is an actual controversy. This two-step inquiry provides that there must be '(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity,'" quoting *Cygnus Therapeutics Systems v. ALZA Corp.*, 92 F.3d 1153, 1159 (Fed. Cir. 1996)), cert. denied, 525 U.S. 1143 (1999), overruled on other grounds, *Midwest Industries, Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999); *GAF Building Materials Corp. v. Elk Corporation of Dallas*, 92 F.3d 479, 481 (Fed. Cir. 1996) (same). The test "is objective and is applied to the facts existing when the complaint is filed." *Arrowhead*, *supra*, 846 F.2d at 736; *Iridium Corp. of America v. Semi-Alloys, Inc.*, 781 F.2d 897, 883 (Fed. Cir. 1985). Thus, "later events may not create jurisdiction where none existed at the time the suit is filed." *Spectronics Corp. v. H.B. Fuller Co., Inc.*, 940 F.2d 631, 883 (Fed.Cir. 1991). The the first part of the test focuses on defendant's conduct, while the second focuses upon plaintiff's. *Arrowhead*, *supra*, 846 F.2d at 736.

There is no dispute that the first element of the *Arrowhead* test is met in this case, because Pro Softnet is using technology continuously in its business that 2M has suggested it license under the '254 patent.[23] See *Arrowhead*, *supra*, 846 F.2d at 736 ("Plaintiff must be engaged in an actual making, selling, or using activity subject to an infringement charge or must have made meaningful preparation for such activity"); see also *GAF Building Materials Corp.*, *supra*, 92 F.3d at 481

---

[23]Pl's. Opp. at 3 (stating "there is no serious dispute that the first element of the test is met [because] Pro Softnet is actively engaged in a business using technology that 2M contends requires a license under the '254 patent"); see also Kulkarni Decl., ¶¶ 2-3.

1  ("'the plaintiff . . . must have actually produced the accused device or have actually prepared to

2  produce such a device,'" quoting *Jervis B. Webb Co. v. Southern Systems, Inc.*, 742 F.2d 1388,

3  1398-99 (Fed. Cir. 1984) (citations omitted)).  The court must thus examine whether plaintiff has

4  a reasonable apprehension that it will face an infringement suit.

5          There are no concrete rules or guidelines for determining when a declaratory plaintiff has

6  a reasonable apprehension of suit.  See *Super Sack Manufacturing Corp. v. Chase Packaging*

7  *Corp.*, 57 F.3d 1054, 1058 (Fed. Cir. 1995) ("Because we test the presence *vel non* of an actual

8  controversy by reference to the facts of each case, generally applicable rules are few").  Some

9  broad principles can be stated, however.

10         "Respecting defendant's conduct, it must be such as to indicate defendant's intent

11         to enforce its patent.  If defendant has expressly charged a current activity of the

12         plaintiff as an infringement, there is clearly an actual controversy, certainty has

13         rendered apprehension irrelevant, and one need say no more.   In light of the

14         subtleties in lawyer language, however, the courts have not required an express

15         infringement charge.  When the defendant's conduct, including its statements, falls

16         short of an express charge, one must consider the 'totality of the circumstances' in

17         determining whether that conduct meets the [reasonable apprehension] prong of the

18         test.  If the circumstances warrant, a reasonable apprehension may be found in the

19         absence of any communication from defendant to plaintiff.  If, on the other hand,

20         defendant has done nothing but obtain a patent, there can be no basis for the

21         required apprehension, a rule that protects quiescent patent owners against

22         unwarranted litigation." *Arrowhead*, *supra*, 846 F.3d at 737.

23         Pro Softnet does not argue that 2M made a specific assertion of infringement that led to

24  the filing of this suit.  Accordingly, the court must look to the totality of the circumstances to

25  evaluate whether Pro Softnet's apprehension of suit was objectively reasonable.  In conducting

26  this evaluation, the court initially considers the letters sent by 2M.  It then examines the other

27  circumstances Pro Softnet has identified as contributing to its reasonable apprehension of suit.

28

8

1        **1.    The February 11 And March 19 Letters**

2            2M asserts that the content of its letters could not have created a reasonable apprehension

3    of litigation because they proposed a licensing agreement between the parties.[24] 2M is correct that

4    under relevant Federal Circuit precedent, the offer of a license agreement generally does not give

5    rise to an actual controversy.  In *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*, 57

6    F.3d 1051 (Fed. Cir. 1995), counsel for defendant Kato contacted plaintiff Phillips, a fastener

7    manufacturer, suggesting that certain of Phillips' fasteners were "covered by" Kato's patent. . .

8    ."  The letter "invit[ed] Phillips to take a license under the patent."  *Id.* at 1052.  Phillips

9    responded, challenging the validity of the patent.  *Id.*  Communications between the parties ceased

10   while Kato sought and obtained a reissue of its patent.  Phillips participated in the procedure as

11   a protester.  *Id.*  Following reissuance, counsel for Kato again wrote Phillips.  He enclosed a copy

12   of the reissued patent and offered a license "assuming that an appropriate agreement can be

13   reached concerning the terms."  *Id.*  After additional communications, none of which resulted in

14   a formal licensing agreement, Phillips filed an action seeking a declaratory judgment of invalidity

15   and/or noninfringement of the reissued patent.  *Id.*

16           The district court found that Kato's letters offering a licensing agreement "were insufficient

17   to establish in Phillips . . . a reasonable apprehension of suit."  *Id.*  The Federal Circuit affirmed,

18   holding that "the offer of a patent license does not create an actual controversy."  *Id.* at 1053.  The

19   circuit court stated that declaratory justiciability usually requires "an explicit threat or other action

20   by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff

21   that it will face and infringement suit."  *Id.* (quoting *BP Chemicals, Ltd. v. Union Carbide Corp.*,

22   4 F.3d 975, 977 (Fed. Cir. 1993)).  Although the court noted that an explicit threat of suit or

23   charge of infringement is not always required, it concluded that "a patentee's attempt to conduct

24   license negotiations is a commercial activity.  Kato's activity was not a threat of suit, and did not

25   create a justiciable controversy."  *Phillips Plastics, supra*, 57 F.3d at 1054.

26           *Phillips Plastics* is virtually indistinguishable from this case.  As in *Phillips*, 2M's letters

27   _____

28        [24]Def's. Mot. at 4.

                                           9

1  to Pro Softnet focused on licensing opportunities.  2M did not explicitly charge that Pro Softnet

2  was infringing, nor did it state – as defendant did in *Phillips* – that Pro Softnet's products were

3  "covered by" the '254 patent.  See *Phillips Plastics, supra*, 57 F.3d at 1054 (noting that in *Shell*

4  *Oil v. Amoco*, 970 F.2d 885, 889 (Fed.Cir.1992), the court declined to find a reasonable

5  apprehension of suit even though the patentee stated that "the alleged infringer's activities 'f[e]ll

6  within,' [were] 'covered by,' and [were] 'operations under' the patent"); compare *Sierra Applied*

7  *Sciences, Inc. v. Advanced Energy Industries, Inc.*, 363 F.3d 1361, 1374 (Fed. Cir. 2004) (noting

8  that "AEI's express charge of infringement sufficed to establish a reasonable apprehension that

9  AEI would assert its patent portfolio against Sierra for making, using, or selling the 2 kW

10  supply").  Further, as in *Phillips*, 2M's licensing offer had neither expired nor been withdrawn

11  at the time Pro Softnet filed this action.  See *Phillips Plastics, supra*, 57 F.3d at 1053.

12       Pro Softnet attempts to distinguish *Phillips*, arguing that "there was no ongoing

13  'negotiation'" between the parties.[25]  The *Phillips* court's decision was influenced by the fact that

14  there was "no question that a license was available to Phillips [at the time it filed suit] . . . if such

15  were needed."  *Id.* at 1053.  The same is true here, as it is clear Pro Softnet could have licensed

16  the '254 patent at the time it filed its complaint on March 31.  Although Pro Softnet insists that

17  its February 23 Letter "unequivocally terminat[ed] . . . any further discussion" regarding

18

19

20

21

22

23

24

25

26

27
_____

28       [25]Pl's. Opp. at 10.

10

1   licensing opportunities,[26] 2M's March 19 response explicitly reasserted the licensing offer.[27]

2   More importantly, the March 19 letter did not escalate the discussion in a way that reasonably

3   increased Pro Softnet's apprehension of suit.  Rather, the letter clarified 2M's initial offer, and

4   asked for more information regarding Kulkarni's assertion that the' 254 patent was invalid in light

5   of prior art.[28]

6           Given *Phillips*' clear holding that "a patentee's attempt to conduct license negotiations is

7   a commercial activity" (*id.* at 1054), the letters sent by 2M cannot, standing alone, have created

8   an objectively reasonable apprehension of suit.[29]  See also *SRI Int'l, Inc. v. Advanced Tech. Lab.,*

9   *Inc.*, 127 F.3d 1462, 1469-70 (Fed. Cir. 1997) (a patentee's letter to a potential infringer, which

10  enclosed a copy of the patent, noted possible infringement, and offered a nonexclusive license,

---

12  [26]Kulkarni Decl., ¶ 11 ("my February 23 letter communicated that Pro Softnet was not
13  negotiating, and would not negotiate, for any license from 2M").  A review of Pro Softnet's
    letter, however, reveals that it is not quite as explicit as Kulkarni suggests.  (See February 23
14  Letter (stating "we have no need to license any third party technology," and closing "[w]e
    appreciate your interest in contacting us.  If there is a need for further communication, we will
15  involve . . . our litigation attorney firm"); compare *Oce-Office Systems, Inc. v. Eastman Kodak*
16  *Co.*, 805 F. Supp. 642, 646-47 (N.D. Ill. 1992) (noting that "[l]icensing discussions . . . fail[ed]"
    when "Océ steadfastly maintained its position that its 2500 copier did not infringe Kodak's '387
17  patent . . . [a]nd Kodak equally tenaciously maintained its infringement position and the
    requirements for a license.  So, at the conclusion of the March 31 meeting, Océ determined that
18  the discussions were fruitless and ended the negotiations").

19
20  [27]See March 19 Letter (stating "we are suggesting that you study the '254 patent with a
    view towards taking a license under it as to your existing technology," and requesting a response
21  by March 31, 2004).

22  [28]*Id.* ("If you have any documents or other evidence that you believe renders the claims
    of the '254 patent invalid, we kindly request that you forward that information to us along with
23  an explanation of why you believe such evidence would render the claims of the '254 patent
24  invalid").

25  [29]Plaintiff asserts that "where there are no ongoing negotiations between the parties, 'it
    simply cannot be said that the plaintiffs resorted to the declaratory judgment action in order to
26  gain an advantage in any ongoing negotiations.'" (Pl's. Opp. at 10 (quoting *Conmed Corp. v.*
    *Erbe Electromedizin GmbH*, 129 F.Supp. 2d 461, 468 (N.D.N.Y. 2001)).  The relevance of this
27  point is unclear.  In *Conmed*, defendant accused plaintiff of filing the suit gain a bargaining
28  advantage; here, 2M has not made this assertion.

did not create an actual controversy under the Declaratory Judgment Act); *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 811 (Fed. Cir. 1996) ("[a] patentee's offer of a license, without more, is insufficient to establish the predicate for declaratory judgment jurisdiction"); *Indium Corp. of America v. Semi-Alloys, Inc.*, 781 F.2d 879, 883 (Fed. Cir. 1985) ("Semi-Alloys' letter of February 22, 1982 . . . was a mere offer of a license and not in itself, or taken together with the litigation history, a sufficient basis for declaratory jurisdiction"); *Minds-Eye-View, Inc. v. Interactive Pictures Corp.*, 58 F. Supp. 2d 5, 8 (N.D.N.Y. 1999) ("There can, in general, be no reasonable apprehension of suit where the patent holder has not indicated any opinion with regard to whether the actual plaintiff who seeks the declaratory judgment has itself infringed a relevant patent.  Thus, evidence that a patent holder will bring suit where it perceives its patent to be infringed has been held to create a reasonable apprehension of suit where additional conduct by the patent holder indicated that it specifically found the declaratory judgment plaintiff's conduct to be infringing" (citations omitted)); *Waters Corp. v. Hewlett-Packard Co.* 999 F. Supp. 167, 171 (D. Mass. 1998) ("the Federal Circuit has consistently found that neither the patentee's offer of a license nor its attempt to negotiate a license is enough to create an actual controversy"); compare *Sierra Applied Sciences*, *supra*, 363 F.3d at 1375 (where letters sent to plaintiff "referred to several newly-issued patents" and charged infringement, "it would be reasonable to apprehend that any infringement suit would be aimed at *all* of [plaintiff's] activities").

> ## 2.   Whether Other "Objective Circumstances" Support A Finding Of Reasonable Apprehension

In addition to the content of 2M's letters, Pro Softnet cites a number of other circumstances that purportedly made its apprehension of suit reasonable.  Specifically, Pro Softnet asserts that 2M's initial contact was a certified letter sent by an attorney;[30] it details Kulkarni's concern upon visiting the website of 2M's attorney and learning that he was a patent litigator;[31] it repeatedly asserts that Kulkarni felt 2m was a "small-time 'inventor' [that] came out of nowhere to make

---

[30]See Pl's. Opp. at 4.

[31]*Id.*

12

1  outlandishly broad patent claims;"[32] and it states that Kulkarni was unable to find a website for

2  2M, discover information about its business, or find colleagues in the industry who knew of the

3  company.

4  While these factors might serve, and apparently did serve, to make Kulkarni subjectively

5  apprehensive, the test asks whether plaintiff's apprehension of suit is *objectively reasonable*.

6  *Phillips Plastics*, *supra*, 57 F.3d at 1053-54 ("[t]he 'reasonable apprehension of suit' test requires

7  more than the nervous state of mind of a possible infringer; it requires that the objective

8  circumstances support such an apprehension"); *Arrowhead*, *supra*, 846 F.2d at 736 (the test "is

9  objective and is applied to the facts existing when the complaint is filed"); *Iridium Corp.*, *supra*,

10 781 F.2d at 883 ("[t]he test is an objective one – reasonable apprehension, like other jurisdictional

11 prerequisites, must exist at the time suit is filed. . . .  A purely subjective apprehension of an

12 infringement suit is insufficient to satisfy the actual controversy requirement").

13 Although Pro Softnet has adduced ample evidence regarding Kulkarni's state of mind, "a

14 subjective apprehension is insufficient without objective substance." *BP Chemicals*, *supra*, 4 F.3d

15 at 979.  As a result, the mere fact that Kulkarni was subjectively concerned Pro Softnet would be

16 sued on March 31 does not suffice to vest the court with subject matter jurisdiction to hear this

17 action.   See  *K-Lath v. Davis Wire Cop.*, 15 F. Supp. 2d 952, 962 (C.D. Cal. 1998)

18 (notwithstanding the fact that plaintiff "subjectively feared suit," dismissal was appropriate where

19 an objective examination revealed that defendants' conduct did not rise "to a level sufficient to

20 indicate an intent to enforce (their) patent" (citation and internal quotation marks omitted)

21 (brackets original)).

22 Pro Softnet argues that 2M's letters were "set ups" that were "intended to establish willful

23 infringement" on its part of the '254 patent.[33]  As evidence of this, it proffers an August 4, 2003,

24 letter addressed to Paul Gigg, the president of Xdrive, Inc.  This letter is identical to the February

25

26 _____

27 [32]*Id.* at 5-6.

28 [33]Pl's. Opp. at 6.

12 Letter 2M sent Pro Softnet.[34]  Pro Softnet notes that 2M subsequently sued Xdrive in South

Carolina on February 6, 2004.[35]  The complaint in that action alleges that 2M "provided written

notice by certified mail of the '254 patent to . . . Xdrive . . . and requested that [Xdrive] study

the '254 patent and contact 2M to discuss licensing of the '254 patent." Xdrive, moreover, is not

the only defendant; in all, the South Carolina complaint names ten separate companies that have

allegedly infringed 2M's patent.[36]  Pro Softnet contends that the fact of the lawsuit, and the

allegations it contains, shows that the February 12 letter was a set up.[37]

As a threshold matter, the court notes that Pro Softnet proffers no evidence as to when it

learned of the filing of the South Carolina action.  Only information that the plaintiff knew "at

the time suit is filed" can be considered in assessing whether it had an objectively reasonable

apprehension of suit. *Indium*, *supra*, 781 F.2d at 883; see also *Conmed Corp.*, *supra*, 129 F.

Supp. 2d at 465 (noting that the test "requires an objective evaluation of the facts as they existed

and were known to the plaintiffs *as of the date the complaint was filed*" (emphasis added)).

Because Pro Softnet has not demonstrated that it knew of 2M's communications with and suits

against other companies at the time it filed this action, the court cannot consider those facts in

evaluating whether it reasonably apprehended litigation.[38]

Additionally, Pro Softnet has adduced no evidence regarding the communications and

interactions between 2M and the companies it eventually sued prior to the time litigation

---

[34]Declaration of Shelli Paletz ("Paletz Decl."), Ex. 5.

[35]*Id.*, Ex. 6.

[36]See Def's. Mot., Ex. E (naming nine defendants in addition to Xdrive).

[37]*Id.* at ¶ 12.

[38]A declaration submitted by one of 2M's attorneys strongly suggests that Pro Softnet did not know of the South Carolina action at the time it filed its complaint.  (See Declaration of C. Dale Quisenberry ("Quisenberry Decl."), ¶ 2 ("[a]fter this lawsuit was filed, during a telephone conversation with one of Plaintiff's counsel of record, I advised such counsel of a pending lawsuit in South Carolina that 2M had filed for infringement of the same patent at issue in this case.  Such counsel's response indicated that he was unaware of the South Carolina lawsuit").

1  commenced. As a result, the court cannot ascertain whether Pro Softnet's experience is typical

2  or atypical in any pertinent way. Although "a patent owner's willingness and capacity to enforce

3  its patent rights is pertinent to the inquiry for an actual controversy," it is not conclusive. *West*

4  *Interactive Corp., v. First Data Resources, Inc.*, 972 F.2d 1295, 1298 (Fed. Cir. 1992) ("West

5  argues that First Data's filings against 900 Million, Inc., Madmony Productions, Inc. and Avi

6  Madmony support the reasonableness of West's apprehension. The district court correctly noted

7  that a patent owner's willingness and capacity to enforce its patent rights is pertinent to the inquiry

8  for an actual controversy. . . . This showing, however, is not always conclusive"). Here, even

9  were there evidence that Pro Softnet knew of 2M's South Carolina lawsuit at the time it initiated

10 this action, the court would be unable to determine the evidentiary significance of 2M's effort to

11 enforce its patent rights against those entities. There is no evidence, for example, whether each

12 of the entities sued unequivocally rejected the offer of a license, whether it refused to respond to

13 2M's communications, or whether 2M at some point asserted that it infringed the '254 patent.

14      Ultimately, "to invoke the court's declaratory judgment jurisdiction, a plaintiff must show

15 'more than the nervous state of mind of a possible infringer.'" *Vanguard Research, supra*, 304

16 F.3d at 1254-55 (internal citations omitted). Here, the facts that Pro Softnet has shown it knew

17 on March 31 do not demonstrate that it had an objectively reasonable apprehension of suit at that

18 time. See *Sierra Applied Sciences, supra*, 363 F.3d at 1376 ("'[L]ater events may not create

19 jurisdiction where none existed at the time of filing,'" quoting *GAF Bldg. Materials Corp., supra*,

20 90 F.3d at 483); *Premo Pharmaceutical Laboratories, Inc. v. Pfizer Pharmaceuticals, Inc.*, 465

21 F. Supp. 1281, 1283 (N.D.N.Y. 1979) ("[t]o establish an actual controversy in an action

22 challenging the validity of a patent, the plaintiff must disclose conduct [o]n the part of the

23 defendant that makes reasonable the plaintiff's apprehension that it will face an infringement suit

24 or the threat of one if it commences, or continues the activity in question"). Because the objective

25 circumstances, viewed in totality, do not indicate that there was an actual controversy at the time

26 plaintiff filed suit, the court is without jurisdiction and dismissal under Rule 12(b)(1) is proper.

27      **C.    Even If There Were Jurisdiction, The Court Would Decline To Exercise It**

28      The Declaratory Judgment Act gives district courts a "unique breadth of . . . discretion

to decline to enter a declaratory judgment" even if jurisdiction exists. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995); see also *Perez v. Ledesma*, 401 U.S. 82, 119, n. 12 (1971) (Brennan, J., dissenting) ("The federal declaratory judgment is not a prize to the winner of a race to the courthouses . . ."). Thus, "as long as the district court acts in accordance with the purposes of the Declaratory Judgment Act and the principles of sound judicial administration, the court has broad discretion to refuse to entertain a declaratory judgment action." *EMC Corp.*, *supra*, 89 F.3d at 813-14; see also *Serco Services Co. v. Kelley Co.*, 51 F.3d 1037, 1039 (Fed. Cir. 1995) (a court may dismiss a declaratory judgment action if its action is based on "a reasoned judgment whether the investment of time and resources will be worthwhile"). In exercising discretion, the court should "examine whether hearing the declaratory judgment action would serve the objectives for which the Declaratory Judgment Act was created." *EMC Corp.*, *supra*, 89 F.3d at 814.

Even if the court were to find sufficient evidence of adverseness and reasonable apprehension of suit at the time plaintiff commenced this action, that evidence would be weak at best, and would not be adequate to convince the court that adjudicating the suit would be a wise use of judicial resources. See *Bausch & Lomb Inc. v. CIBA Corp.*, 39 F. Supp. 2d 271, 275 (W.D.N.Y. 1999) (". . . given the lack of evidence that B & L had indicating that CIBA was likely to bring an infringement action against it, allowing the action to go forward would encourage forum shopping and the filing of premature, purely anticipatory declaratory judgment complaints, which are not among the purposes the Declaratory Judgment Act was designed to promote"); *Eli's Chicago Finest, Inc. v. Cheesecake Factory, Inc.*, 23 F. Supp. 2d 906, 908 (N.D. Ill. 1998) ("Based on the facts presented here, it appears to the Court that Plaintiff filed this action, not to 'avoid the accrual of avoidable damages,' because Plaintiff was not certain of its rights, but rather to secure this venue in anticipation of legal action by Defendant").

Additionally, exercising jurisdiction over this action would not advance the strong judicial policy of encouraging out-of-court settlement of disputes. Compare *EMC Corp.*, *supra*, 89 F.3d at 815 (holding that the district court could properly have viewed a declaratory judgment complaint as a tactical measure filed to improve plaintiff's negotiating position, and concluding "that th[e] case was not one that furthered the objectives of the Declaratory Judgment Act").

1   Although 2M renewed its offer to engage in licensing discussions and invited Pro Softnet to

2   provide evidence regarding its invalidity contention, Pro Softnet refused to respond and instead

3   filed this action.  As a consequence, Pro Softnet effectively prevented any non-judicial resolution

4   of the dispute.  Accordingly, to the extent an actual controversy exists, the court declines to

5   exercise its discretion under the Declaratory Judgment Act to adjudicate the dispute.

6   **D.      The Court Cannot Exercise Personal Jurisdiction Over Defendant 2M**

7           Although the court has concluded that dismissal is proper for lack of subject matter

8   jurisdiction, it notes that dismissal would alternatively be appropriate because 2M is not subject

9   to personal jurisdiction in this forum.   Under Rule 12(b)(2) of the Federal Rules of Civil

10   Procedure, the court may decide the question of personal jurisdiction on the basis of affidavits and

11   documentary evidence submitted by the parties, or hold an evidentiary hearing regarding the

12   matter.  See 5A Charles A. Wright & Arthur Miller, FEDERAL PRACTICE AND PROCEDURE,

13   § 1351, pp. 253-59 and n. 31-35 (2d ed. 1990); *Data Disk, Inc. v. Systems Tech. Assoc., Inc.*,

14   557 F.2d 1280, 1285 (9th Cir. 1977); *Rose v. Granite City Police Dept.*, 813 F. Supp. 319, 321

15   (E.D. Pa. 1993).  Whichever procedure is used, plaintiff bears the burden of establishing that

16   defendant has sufficient minimum contacts with the forum to make the exercise of jurisdiction

17   appropriate. See *Pieczenik v. Dyax Corp.*, 265 F.3d 1329, 1334 (Fed. Cir. 2001); *Inamed Corp.*

18   *v. Kuzmak*, 249 F.3d 1356, 1360 (Fed. Cir. 2001).  In this case, the parties have submitted

19   declarations and documentary evidence providing an adequate basis for evaluating jurisdiction.

20   Accordingly, no evidentiary hearing is necessary.

21           Because this matter is being decided on the basis of affidavits and documentary evidence,

22   plaintiffs need only make a prima facie showing of personal jurisdiction.  See *Electronics for*

23   *Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1348 (Fed. Cir. 2003); *Deprenyl Animal Health, Inc. v.*

24   *University of Toronto Innovations Foundation*, 297 F.3d 1343, 1347 (Fed. Cir. 2002); *Fields v.*

25   *Sedgwick Associated Risks, Ltd.*, 796 F.2d 299, 301 (9th Cir. 1986); see also *Graphic Controls*

26   *Corp. v. Utah Medical Products, Inc.*, 149 F.3d 1382, 1383, n. 1 (Fed.Cir. 1998); *Phonometrics,*

27   *Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1468 (Fed.Cir. 1998).   All allegations in

28   plaintiff's complaint must be taken as true, to the extent not controverted by defendant's

affidavits, and all conflicts in the evidence must be resolved in plaintiff's favor. *Electronics for Imaging, supra*, 340 F.3d at 1348; *Deprenyl Animal Health, supra*, 297 F.3d at 1347; *AT&T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996). "'[T]he plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party.'" *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995).

### 1.   Applicable Law

Because plaintiff seeks a declaratory judgment of non-infringement or invalidity regarding defendant's patent, the law of the Federal Circuit governs decision of the personal jurisdiction question. See *Silent Drive, Inc. v. Strong Industries*, Inc., 326 F.3d 1194, 1201 (Fed. Cir. 2003) ("Because the issue of personal jurisdiction in a declaratory action for patent invalidity and non-infringement is intimately related to patent law, personal jurisdiction over Count III is governed by the law of this circuit"); *Inamed Corp., supra*, 249 F.3d at 1359 ("we apply the law of the Federal Circuit, rather than that of the regional circuit in which the case arose, when we determine whether a district court properly declined jurisdiction, because the jurisdictional question here is 'intimately involved with the substance of the patent laws,'" citing *Akro Corp. v. Luker*, 45 F.3d 1541, 1543 (Fed. Cir. 1995)); *3D Systems, Inc. v. Aarotech Laboratories, Inc.*, 160 F.3d 1373, 1377 (Fed. Cir. 1998) ("when analyzing personal jurisdiction for purposes of compliance with federal due process, Federal Circuit law, rather than regional circuit law, applies"); *Dainippon Screen Mfg. Co. v. CFMT, Inc.*, 142 F.3d 1266, 1269 (Fed.Cir. 1998) ("we apply the law of our circuit, rather than that of the regional circuit in which the case arose, when we determine whether the district court properly declined jurisdiction over an out-of-state patentee").

### 2.   Substantive Standard

Whether a federal court can exercise personal jurisdiction over a non-resident defendant turns on two independent considerations: whether an applicable state rule or statute permits service of process on the defendant, and whether assertion of personal jurisdiction comports with constitutional due process principles. See *Inamed Corp., supra*, 249 F.3d at 1359; *3D Systems, supra*, 160 F.3d at 1376-77; *Dainippon Screen Mfg. Co., supra*, 142 F.3d at 1269-70.

California's long-arm statute extends jurisdiction to the limits of constitutional due process. See *Gordy v. Daily News, L.P.*, 95 F.3d 829, 831 (9th Cir. 1996); CAL. CODE. CIV. PROC. § 410.10 ("A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States"). Consequently, when service of process has been effected under California law, the two prongs of the jurisdictional analysis collapse into one – whether the exercise of jurisdiction over the defendant comports with due process. See *Inamed Corp., supra*, 249 F.3d at 1360 ("because California's long-arm statute is coextensive with the limits of due process, the two inquiries collapse into a single inquiry; whether jurisdiction comports with due process"); *Fireman's Fund Ins. Co. v. National Bank of Cooperative*, 103 F.3d 888, 893 (9th Cir. 1996); *Aanestad v. Beech Aircraft* Corp., 521 F.2d 1298, 1300 (9th Cir. 1974).

The Fourteenth Amendment's Due Process Clause permits courts to exercise personal jurisdiction over any defendant that has sufficient "minimum contacts" with the forum state that the "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). There are two recognized bases for exercising personal jurisdiction over nonresident defendants: (1) "general jurisdiction," which arises where the defendant's activities in the forum state are sufficiently "substantial" or "continuous and systematic" to justify the exercise of jurisdiction over it in all matters; and (2) "specific jurisdiction," which arises when a defendant's specific contacts with the forum have given rise to the claim in question. See *Helicopteros Nacionales de Columbia S.A. v. Hall*, 466 U.S. 408, 414-16 (1984); see also *Deprenyl Animal Health, supra*, 297 F.3d at 1350 ("Where a defendant's contacts are continuous and systematic, due process permits the exercise of general jurisdiction. . . . For specific jurisdiction, the 'minimum contacts' prong requires the plaintiff to show that the defendant 'has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities'"). In evaluating specific jurisdiction, the Federal Circuit uses a three-factor test: "(1) whether the defendant 'purposefully directed' its activities at residents of the forum; (2) whether the claim 'arises out of or relates to' the defendant's activities with the forum; and (3)

whether assertion of personal jurisdiction is 'reasonable and fair.'" *Inamed Corp.*, *supra*, 249 F.3d at 1360 (citing *Akro Corp.*, *supra*, 45 F.3d at 1545).

### 4.   The Court Cannot Assert Specific Jurisdiction Over 2M[39]

It is undisputed that 2M does not own real estate or other property in California;[40] that it does not have a business address, office facility, post office address, or telephone number in California;[41] that it does not have assets, bank accounts, or inventory in California;[42] and that it does not manufacture or deliver any products in California ot have patent licensees in the state.[43] Further, 2M has no employees, agents, or representatives in California.[44]

Plaintiff nevertheless points to two groups of contacts that it alleges supports the exercise of personal jurisdiction over 2M.  First, plaintiff insists that 2M conducts business in the state of California by virtue of sending letters offering licenses to individuals and corporations located

---

[39]As noted, a court may exercise general jurisdiction over a defendant if the defendant's contacts with the forum are "substantial" or "continuous and systematic." *International Shoe*, *supra*, 326 U.S. at 316; see also *Data Disc*, *supra*, 557 F.2d at 1287.  Properly invoked, general jurisdiction allows a federal court to hear *any* cause of action against the defendant, even one unrelated to its activities in the forum state. *Perkins*, *supra*, 342 U.S. at 445.  To determine if a defendant's activities within the forum are "continuous and systematic" or "substantial," the court must examine all conduct in which it has engaged impacting the state, including whether it makes sales, solicits or engages in business, serves the state's markets, designates an agent for service of process, holds a license, or has employees there.  See *Helicopteros*, *supra*, 466 U.S. at 411; *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980); *Perkins*, *supra*, 342 U.S. at 445-49 (1952).  Here, plaintiff makes no argument that the court has general jurisdiction over defendant 2M. (See Pl's. Opp. at 11-14 (focusing on the specific contacts of 2M and Mundry, and failing to argue that general jurisdiction exists)).  As a result, the court addresses only whether the exercise of specific jurisdiction would be appropriate.

[40]Mundry Decl., ¶ 6.

[41]*Id.*

[42]*Id.*, ¶ 7.

[43]*Id.*, ¶ 8.

[44]*Id.*, ¶ 9.

1    within the state.[45]  Plaintiff concedes, however, that "[n]umerous cases hold that the singular act

2    by a patentee of sending a letter into a state, whether to offer a license or to accuse someone of

3    infringement, is not *in itself* sufficient to establish personal jurisdiction in that state."[46]  In fact,

4    the Federal Circuit has repeatedly held that finding jurisdiction based on such limited contacts

5    would violate the traditional notions of fair play and substantial justice. See *Silent Drive*, *supra*,

6    326 F.3d at 1202 (stating that under the "fairness" prong of the three-part test elucidated in *Akro*,

7    *supra*, "the sending of letters threatening infringement litigation is not sufficient to confer

8    personal jurisdiction"); *Hildebrand v. Steck Manufacturing Co.*, 279 F.3d 1351, 1356 (Fed. Cir.

9    2002) (noting that "[f]airness and reasonableness demand that a patentee be free to inform a party

10   who happens to be located in a particular forum of suspected infringement without the risk of

11   being subjected to a law suit in that forum," and declining to exercise jurisdiction where "[a]ll

12   of [defendant's] documented contacts were for the purpose of warning against infringement or

13   negotiating license agreements, and he lacked a binding obligation in the forum"); *Inamed Corp.*,

14   *supra*, 249 F.3d at 1361 ("We have . . . repeatedly held that the sending of an infringement letter,

15   without more, is insufficient to satisfy the requirements of due process when exercising

16   jurisdiction over an out-of-state patentee"); *Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt,

17   Inc.*, 148 F.3d 1355, 1356 (Fed. Cir. 1998) (stating that "[a] patentee should not subject itself to

18   personal jurisdiction in a forum solely by informing a party who happens to be located there of

19   suspected infringement.  Grounding personal jurisdiction on such contacts alone would not

20   comport with principles of fairness," and further concluding that "an offer for a license within

21   a cease-and-desist letter does not somehow convert that letter into something more than it was

22   already").

23        Because 2M's letters do not, standing alone, constitute sufficient contacts with the state to

24

25   [45]Pl's. Opp. at 13 ("It is clear that 2M has conduced its business in California as in other
     states. 2M adamantly contends that it offered a license to Pro Softnet in California, and engaged
26   in negotiations for such a license in California. As well, 2M has judicially admitted that it offered
27   a license to at least one other California business – Xdrive in Santa Monica, California").

28   [46]*Id.* at 14.

                                                  21

1  warrant the exercise of specific jurisdiction, the court must evaluate whether plaintiff has adduced

2  evidence that 2M directed "other activities" at the forum that are related to the claim being

3  asserted in this action. See *Silent Drive*, *supra*, 326 F.3d at 1202 ("For the exercise of personal

4  jurisdiction to comport with fair play and substantial justice, there must be 'other activities'

5  directed at the forum and related to the cause of action besides the letters threatening an

6  infringement suit"); *Inamed Corp.*, *supra*, 249 F.3d at 1361 ("We thus consider whether there

7  were 'other activities' sufficient to meet the 'minimum contacts' requirement of *International*

8  *Shoe*"). Plaintiff contends it has adduced evidence of this type of activity, citing the fact that Uwe

9  Mundry, one of 2M's owners and the co-inventor of the '254 patent,[47] "was a resident of

10  California when he applied for the subject technology." In support, plaintiff proffers the

11  declaration of one of its attorneys, who states that an investigation service employed by counsel

12  "reported that Mr. Mundry lived in California from 1992 through at least 2000, at addresses in

13  Larkspur and Mountain View, California."[48] Although conceding that he applied for the '254

14  patent while he resided in California,[49] Mundry disputes in a supplemental declaration that

15  this supports a finding of minimum contacts. Mundry confirms that he lived in California from

16  1992 to 1995, and from 1997 to 1999,[50] but contends that "[a]t no time while [he] lived in

17  California did [his] employment involve the subject matter of the '254 patent."[51] Rather, he

18  maintains, "the first substantive communication . . . received from the U.S. Patent and

19  Trademark Office concerning the ['254 patent application] was not sent until August 2000, well

20

---

21  [47]Mundry Decl., ¶ 11.

22  [48]Declaration of Eric S. Engel ("Engel Decl."), ¶ 3.

23  [49]See Def's. Reply at 9 ("While the U.S. application (that [led] to the '254 patent) was
24  filed in March of 1999, Mr. Mundry only lived in California for another 3 months, moving to
   South Carolina in July of 1999").
25

26  [50]See Supplemental Declaration of Uwe Mundry ("Mundry Supp. Decl."), ¶ 3. The more
   precise dates provided by Mundry demonstrate that when Mundry applied for a foreign patent on
27  the invention on June 24, 1996 (see Engel Decl., ¶ 4), he resided outside the state.

28  [51]*Id.*, ¶ 4.

after I had moved to South Carolina."[52]

The court need not assess whether Mundry's contacts with the state would be sufficient to exercise specific jurisdiction over him as an individual, because only 2M is named as a defendant in the complaint.  As a result, the appropriate inquiry is whether Mundry's contacts can be imputed to 2M for personal jurisdiction purposes.  The court concludes they cannot.

Although plaintiff asserts that "Mundry's contacts with California are ample, and are specific to the '254 patent in issue,"[53] it makes no argument that Mundry was acting on 2M's behalf at the time he engaged in such activities.  This is because the uncontroverted evidence shows that 2M was not formed until after Mundry had moved to South Carolina.[54]  Given this fact, Mundry cannot have been acting as 2M's agent when he resided in California, and his activities during that time are not properly attributed to 2M for jurisdictional purposes.  See *Greenberg v. Miami Children's Hospital Research Institute, Inc.*, 208 F. Supp. 918, 924 (N.D. Ill. 2002) (noting that "[p]laintiffs ha[d] not cited – nor ha[d] the court found – authority for imputing to a corporate party, actions taken by an employee prior to the time of his or her employment for purposes of determining personal jurisdiction," and concluding that the court "[could not] consider actions taken by Matalon or plaintiffs prior to such time as Matalon was employed by Children's Hospital in determining personal jurisdiction over Children's Hospital"); *Orthodontic Centers of America, Inc. v. Vondrak*, No. CIV. A. 96-3992, 1997 WL 476349, * 2, 10 (E.D. La. Aug. 20, 1997) (rejecting plaintiff's assertion that the court could assert personal jurisdiction over corporate defendant Apple on the basis that individual defendant "Vondrak was at all times acting with full knowledge and authority of Apple both during Apple's pre-incorporation phase and following Apple's date of incorporation, when Vondrak became Chief Executive Officer and Chairman of Apple's Board" because "the evidence offered by the parties

---

[52]*Id.*, ¶ 7.

[53]Pl's. Opp. at 12.

[54]See Supp. Mundry Decl., ¶ 5 ("I was not living in California at the time 2M Asset Management, LLC ("2M") was formed.  2M was formed after I moved to South Carolina").

shows that Apple did not exist at all times relevant to the negotiation and signing of the Confidentiality Agreement. Moreover, OCA failed to offer evidence demonstrating that Apple was targeting OCA in Louisiana so that Apple must reasonably anticipate being haled into court in Louisiana.    Therefore, there are no sufficient contacts to establish specific jurisdiction"); compare *Educational Testing Service v. Katzman*, 631 F. Supp. 550, 559 (D.N.J. 1986) (considering an individual's contacts with forum state prior to the incorporation of his business in assessing whether jurisdiction could be exercised over the *individual*); see generally *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 419 (9th Cir. 1977) (stating that "[c]orporations, of course, can only act through agents, and either an individual person . . . or another corporation may act as an agent for a corporate principal so as to subject it to long-arm jurisdiction"); *Bright v. Primary Source Media*, No. 98-1313 MJJ, 1998 WL 671247, *5 (N.D. Cal. Sept. 29, 1998) ("The general rule is that an agent's contacts with the forum are imputed to the principal based on the general law of agency. . . . A corporation can only act through agents, and these agents in turn may be individuals or corporations. . . . An individual or corporation is deemed to be the general agent of the principal if it performs substantial activities for the principal's benefit"); cf. *Purdue Research Foundation v. Sanofi-Synthelabo*, 338 F.3d 773, 784 (Fed. Cir. 2003) (holding that "an assignee [of a contract] does not step automatically into the shoes of the assignor for purposes of personal jurisdiction," and collecting cases).[55]

---

[55]Some courts have held that the pre-incorporation acts of a predecessor corporation can be attributed to a successor corporation for purposes of establishing personal jurisdiction where "the predecessor and the successor are one and the same." *Abbacor, Inc. v. Miller*, No. 01 CIV. 0803(JSM), 2001 WL 1006051, * 4 (S.D.N.Y. Aug. 31, 2001) (citing *St. Paul Fire & Marine Ins. Co. v. Eliahu Ins. Co.*, No. 96 Civ. 7269, 1997 WL 357989, * 4 (S.D.N .Y. June 26, 1997)); see also *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002) (the requirement that personal jurisdiction must be established with respect to each defendant individually "does not preclude us from imputing the jurisdictional contacts of a predecessor corporation to its successor corporation or individual alter ego. . . . [F]ederal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court. The theory underlying these cases is that, because the two corporations (or the corporation and its individual alter ego)

1    Apart from the fact that Mundry lived in California when he applied for the '254 patent,

2    that plaintiff rests its jurisdictional argument exclusively on 2M's letters advising of the patent and

3    offering a license. Because the Federal Circuit has stated conclusively that such activity is not

4    sufficient to warrant the exercise of specific jurisdiction over a patentee (see, e.g., *Inamed Corp.*,

5    *supra*, 249 F.3d at 1361), the court concludes that even if it had subject matter jurisdiction to

6    hear the present dispute, it could not exercise personal jurisdiction over 2M.[56]

7    

8    are the same entity, the jurisdictional contacts of one are the jurisdictional contacts of the other

9    for the purposes of the International Shoe due process analysis"). Even if the court were to

10   conclude that this rule could be used to impute the pre-incorporation contacts of an individual alter

     ego to his corporation, it would nonetheless find that there is no basis to exercise personal

11   jurisdiction over 2M in this case. First, plaintiff has proffered insufficient evidence to support

     an alter ego finding. The fact that Mundry operates 2M from his home (see Engel Decl., ¶ 5;

12   Def.'s Ex. E) does not demonstrate that corporate formalities have been ignored, or that there is

13   a unity of interest between Mundry and 2M. Indeed, the record reflects that Mundry is only one

     of multiple owners of 2M (see Mundry Decl., ¶ 2). Second, even if the court were to impute

14   Mundry's "contacts" with California to 2M, it would find them insufficient to warrant the

     exercise of specific jurisdiction over 2M in this case. The Federal Circuit has made clear that a

15   defendant must "purposefully direct[ ]" its activities at residents of a forum. *Silver Spring*, *supra*,

     326 F.3d at 1202 (citing *Inamed Corp.*, *supra*, 249 F.3d at 1360). To show that a defendant

16   purposefully directed his activities at residents of the state, plaintiff must demonstrate that he

17   "deliberately . . . engaged in significant activities within [the] State, or . . . created continuing

     obligations between himself and residents of the forum. . . ." *Akro*, *supra*, 45 F.3d at 1545. The

18   fact that Mundry lived in California at the time he submitted the application for the '254 patent

19   does not show that he purposefully directed activities at state residents. There is no evidence that

     Mundry collaborated with California residents in developing the patent, or that he interacted with

20   Californians in any relevant way.

21      [56]Nor does the court believe that jurisdictional discovery is warranted. Before it is

22   appropriate to order jurisdictional discovery, it must appear that "pertinent facts bearing on the

     question of jurisdiction are controverted . . . or [that] a more satisfactory showing of the facts

23   is necessary." *Butcher's Union Local No. 498, United Food & Commercial Workers v. SDC*

     *Investment, Inc.*, 788 F.2d 535, 540 (9th Cir. 1986) (quoting *Data Disc*, *supra*, 557 F.2d at 1285,

24   n. 1); see also *United States v. Swiss American Bank, Ltd.*, 274 F.3d 610, 625 (1st Cir. 2001)

25   ("We have long held that 'a diligent plaintiff who sues an out-of-state corporation and who makes

     out a colorable case for the existence of in personam jurisdiction may well be entitled to a

26   modicum of jurisdictional discovery if the corporation interposes a jurisdictional defense,'"

27   quoting *Sunview Condominium Ass'n. v. Flexel International, Ltd.*, 116 F.3d 962, 964 (1st Cir.

     1997)); *Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World*

28   *Corp.*, 230 F.3d 934, 946 (7th Cir. 2000) ("At a minimum, the plaintiff must establish a

## III. CONCLUSION

For the foregoing reasons, the court dismisses this action for lack of subject matter jurisdiction and, in the alternative, for lack of personal jurisdiction.

DATED: July 19, 2004

_Margaret M. Morrow_

MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

---

colorable or prima facie showing of personal jurisdiction before discovery should be permitted"). Here, the pertinent facts are not in dispute, and plaintiff identifies no basis for concluding that it would be able to make a more satisfactory showing if discovery were permitted. Although plaintiff asserts that "2M does not identify who its other owner(s) are, where they reside or where they have conducted 2M's business," it concedes that 2M "is operated from Mr. Mundry's home," which is in South Carolina. (Pl's. Opp. at 11; see also Engel Decl., ¶ 5.) 2M's declarations state that the company "does not sell any products or render any services" in California, and that it has no "licensees of the '254 patent in California." (See Mundry Decl., ¶¶ 4, 8.) For the most part, therefore, the relevant facts are undisputed, and discovery would constitute nothing more than a fishing expedition. See _Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc._, 334 F.3d 390, 402 (4th Cir. 2003) ("When a plaintiff offers only speculation or conclusory assertions about contacts with a forum state, a court is within its discretion in denying jurisdictional discovery"); _Rich v. KIS Cal., Inc._, 121 F.R.D. 254, 259 (M.D.N.C. 1988) ("[W]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by defendants, the Court need not permit even limited discovery confined to issues of personal jurisdiction should it conclude that such discovery would be a fishing expedition").

District courts have "a significant amount of leeway" in granting plaintiffs leave to conduct jurisdictional discovery. _Orchid Biosciences, Inc. v. St. Louis University_, 198 F.R.D. 670, 672 (S.D. Cal. 2001). It is not an abuse of discretion to deny jurisdictional discovery "when it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction." _Wells Fargo & Co. v. Wells Fargo Express Co._, 556 F.2d 406, 430, n. 24 (9th Cir. 1977). Because plaintiff has not shown that additional discovery would reveal a basis for exercising specific jurisdiction over 2M, the court declines to grant plaintiff's request. Cf. _Butcher's Union_, supra, 788 F.2d at 540 (noting that "[t]he trial court still has broad discretion to permit or deny discovery . . . and its decision will not be reversed except 'upon the clearest showing that denial of discovery results in actual and substantial prejudice to the complaining litigant.' . . . In their brief, the Unions state only that they 'believe' that discovery will enable them to demonstrate sufficient California business contacts to establish the court's personal jurisdiction. This speculation does not satisfy the requirement that they make 'the clearest showing' of actual and substantial prejudice").

26